IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**DEBRA MAYS JACKSON**                                              **PLAINTIFF**

VS.                              CIVIL ACTION NO. **3:23-cv-03095-KHJ-MTP**

**TOM DUFF, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITIES, STEVEN
CUNNINGHAM, IN HIS INDIVIDUAL AND OFFICIAL
CAPACITIES, BRUCE MARTIN, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITIES, JEANNE CARTER,
IN HER INDIVIDUAL AND OFFICIAL CAPACITIES,
CHIP MORGAN, IN HIS INDIVIDUAL AND OFFICIAL
CAPACITIES, GEE OLGETREE, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITIES, HAL PARKER, IN HIS
INDIVIDUAL AND OFFICIAL CAPACITIES, J. WATT
STARR, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES,
ALFRED MCNAIR, IN HIS INDIVIDUAL AND
OFFICIAL CAPACITIES, GLENN MCCOLLOUGH, IN HIS
INDIVIDUAL AND OFFICIAL CAPACITIES, SHANE HOOPER,
IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES,
FORD DYE, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES,
ALFRED RANKINS, JR., IN HIS INDIVIDUAL AND OFFICIAL
CAPACITIES, MISSISSIPPI INSTITUTION OF HIGHER LEARNING,
AND JOHN DOES 1-12**                                              **DEFENDANTS**

## COMPLAINT
### JURY TRIAL DEMANDED

**COMES NOW**, Plaintiff Debra Mays Jackson, by and through her attorney, and files this her Complaint, as follows:

### JURISDICTION

1.  This suit is authorized and instituted pursuant to the Fourteenth Amendment of the

1

Constitution of the United States by and through 42 U.S.C. § 1983. Jurisdiction of the Court is invoked pursuant to 28 U.S.C. § 1331.

## VENUE

2.     Venue is proper pursuant to 28 U.S.C. § 1391(b). A substantial part of the events or omissions complained of by Plaintiff occurred in the Northern Division of Southern District of Mississippi.

## PARTIES

3.     Plaintiff Debra Mays Jackson (hereinafter "Jackson") is an adult resident citizen of Hinds County, Mississippi.

4.     Defendant Tom Duff ("Duff") is a member of the Mississippi Institutions of Higher Learning. Duff is being sued in his individual and official capacities. He may be served with process of this Court wherever he may be found.

5.     Defendant Steven Cunningham ("Cunningham") is a member of the IHL. Cunningham is being sued in his individual and official capacities. He may be served with process of this Court wherever he may be found.

6.     Defendant Bruce Martin ("Martin") is a member of the IHL. Martin is being sued in his individual and official capacities. He may be served with process of this Court wherever he may be found.

7.     Defendant Jeanne Carter Luckey ("Luckey") is a member of the IHL. Luckey is being sued in her individual and official capacities. She may be served with process of this Court wherever she may be found.

8.     Defendant Chip Morgan ("Morgan") is a member of the IHL. Morgan is being sued

2

in his individual and official capacities. He may be served with process of this Court wherever he may be found.

9.     Defendant Gee Olgetree ("Olgetree") is a member of the IHL. Olgetree is being sued in his individual and official capacities.  He may be served with process of this Court wherever he may be found.

10.    Defendant Hal Parker ("Parker") is a member of the IHL. Parker is being sued in his individual and official capacities. He may be served with process of this Court wherever he may be found.

11.    Defendant J. Watt Starr ("Star") is a member of the IHL. Starr is being sued in his individual and official capacities. He may be served with process of this Court wherever he may be found.

12.    Defendant Alfred McNair ("McNair") is a member of the IHL. McNair is being sued in his individual and official capacities. He may be served with process of this Court wherever he may be found.

13.    Defendant Glenn McCollough ("McCollough") is a member of the IHL.  McCollough is being sued in his individual and official capacities. He may be served with process of this Court wherever he may be found.

14.    Defendant Shane Hooper ("Hooper") is a member of the IHL. Hooper is being sued in his individual and official capacities. He may be served with process of this Court wherever he may be found.

15.    Defendant Ford Dye ("Dye") is a member of the IHL. Dye is being sued in his individual and official capacities. He may be served with process of this Court wherever he

may be found.

16.     Defendant Alfred Rankins Jr. ("Rankins") is the Commissioner of IHL. Rankins is being sued in his individual and official capacities. He may be served with process of this Court wherever he may be found.

17.     The Institutions of Higher Learning ("IHL") is a political subdivision of the State of Mississippi. The IHL board is empowered to select the Institutional Executive Officer ("IEO"), more commonly known as the President of Jackson State University ("JSU"). IHL may be served with process by service on Lynn Fitch, Attorney General of the State of Mississippi, 450 High Street, Suite 1200, Jackson, Ms. 39201.

18.     John Does 1-12 are individuals unknown to the Plaintiff who advised IHL board members to promote less qualified men over clearly more qualified women for the position of President of JSU. John Does 1-12 also are individuals unknown to the Plaintiff who urged IHL board members to name Hudson President without conducting an adequate investigation to determine Hudson's qualifications and fitness and/or permitted Hudson's friends at IHL and employees at JSU, who were supervised by Hudson. John Does 1-12 also are individuals unknown to the Plaintiff who conducted inadequate investigations into Hudson's fitness to lead JSU after he sent an unwelcomed and uninvited photograph of his genitalia to a JSU employee, demoted another JSU employee who complained about Hudson's unlawful conduct and sent unwelcomed and uninvited photographs of his genitalia to a JSU student.

## STATEMENT OF FACTS

19.     On February 10, 2020, William Bynum ("Bynum"), JSU's 11th President, resigned

after he was charged with prostitution.[1]  At that time, Debra Mays-Jackson ("Mays-Jackson") was JSU's Vice President and Bynum's Chief of Staff. From 2017 through 2020, Mays-Jackson supervised Hudson, who served as a Special Assistant to Bynum.

20. At the time of Bynum's resignation, Commissioner Rankins and his deputy Marcus Thompson, both friends and confidantes of Hudson, orchestrated Hudson's promotion to Interim President by passing over Mays-Jackson who supervised Hudson and was clearly more qualified than Hudson.

21. At approximately 11:30 a.m., on the day of his appointment, Hudson approached Mays-Jackson and told her he was not qualified or prepared to serve as Interim President. Hudson offered Mays-Jackson a $25,000.00 salary increase to continue as Vice President and Chief of Staff.

22. Three days after Hudson was named JSU's Interim President, Rankins announced to JSU's faculty and staff that Hudson would not be permitted to apply for the position of President. Rankins claimed a national search would be conducted to determine who would serve as JSU's 12th President.

23. During Hudson's tenure as Interim President, Hudson sent an employee an unwanted and unwelcomed photograph of his genitalia to a JSU employee. Rankins permitted Thompson and JSU employees Hudson supervised to investigate Hudson, who was the only employee at JSU that IHL supervised. Thompson closed the investigation without questioning the female employee who received the sexually explicit photograph from Hudson. An adequate investigation of Hudson would have revealed Hudson also sent a

---

[1] *State of Mississippi v. William Bynum*, 25C01:20-cr-00121, In the County Court of Hinds County, Mississippi. The case was dismissed. Doc. #: 4.

student and at least one other female employee an unwanted and unwelcomed photograph of his genitalia and demoted a male employee who spoke against Hudson's unlawful conduct.

24. While Hudson was serving as a Special Assistant to Bynum, a group of female employees sent an anonymous letter to Bynum. JSU did not launch an investigation into the allegations in anonymous letter until the female employees anonymously reported that JSU protected high-ranking male employees who regularly sexually harassed women. Daniel Watkins, Dean of the School of Education, resigned after IHL launched an investigation.

25. Despite IHL's awareness that females at JSU routinely were subjected to sexual discrimination and Hudson engaged in unlawful conduct with a female employee, Hudson, Rankins, and Thompson, scheduled a ZOOM call in October of 2020. The purpose of the ZOOM call reportedly was to receive input from constituents about the characteristics and qualifications they wanted the new President to possess. Prior to the ZOOM call, Hudson, Rankins, and Thompson, handpicked JSU employees and Hudson supporters to speak. During the ZOOM call, IHL board members were urged to forego a national search and to name Hudson as JSU's 12th President notwithstanding the fact that Rankins and Thompson were aware of Hudson's unlawful conduct.

26. By November 19, 2020, Rankins and Thompson working with Steven Cunningham, the chair of the search committee to replace Bynum and a Hudson supporter, convinced IHL board members to name Hudson as JSU's 12th President. Each of the IHL board members named as defendants, except Tom Duff, voted to hire Hudson as President. All of the IHL board members knew or should have known of Hudson's unlawful conduct inasmuch as

Commissioner Rankins and his deputy Marcus Thompson was privy to said information.

27. Aggrieved that she was not given an opportunity to compete for the position although she was clearly more qualified than Hudson, Mays-Jackson filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). In her February 10, 2021 Complaint, Mays-Jackson alleged IHL discriminated against her on account of her sex by denying her an opportunity to apply for the job and selected Hudson who was clearly less qualified than she was.

28. On April 27, 2021, IHL responded to Jackson's EEOC complaint. IHL "flatly rejected the notion that Mays-Jackson was more qualified than Hudson." IHL touted experience Hudson gained while serving as Interim President to support its claim that Hudson was more qualified than Mays-Jackson. IHL even boasted about Hudson's work as JSU's Diversity and Equal Opportunity Officer/Title IX Coordinator from 2012 to 2017. IHL, however, did not mention that Hudson, while serving as Interim President, violated Title VII and Title IX of the Civil Rights Act of 1964, both laws he was responsible for enforcing at JSU.

29. Mays-Jackson earned her bachelor's, master's, and specialist's degrees from JSU. She received her doctorate in 2005 from Mississippi State University. Hudson earned his degree in Political Science from JSU and obtained his juris doctor from the University of Mississippi.

30. As JSU's Vice President and Chief of Staff, Mays-Jackson served as Bynum's proxy. In Bynum's absence, Mays-Jackson represented JSU events, university meetings, and IHL board meetings. As Chief of Staff, Mays-Jackson oversaw: 1) Enrollment

7

Management (recruitment, admissions, financial aid, registrar); 2) Student Affairs (deans of students, student life, housing, and residence life, center for student engagement and leadership, veterans & military center, university health center, disability services ADA compliance, careers, student conduct, the Latasha Norman Center and judicial affairs); 3) Student Success (university advising center, student success strategic initiatives); 4) Title III; 5) Construction Project Manager;  6) Public Safety; 7) Internal Audit; 8) Governmental Relations; and 9) Special Assistant to the President.

31.     While serving as Vice President and Chief of Staff, Mays-Jackson reorganized JSU's Division of Public Safety and saved JSU more than one million dollars. Mays-Jackson created the New Student Success Division in collaboration with Georgia State University. This program changed the focus to advising students to graduate on time. After one year of implementing centralized advising, JSU's graduation rate increased by two percent.

32.      Mays-Jackson also restructured JSU's Enrollment Management Division with student needs at its core. By the Fall of 2021, JSU's enrollment increased more than two percent.

33.     Mays-Jackson possessed extensive knowledge in Title III programming as a result of her training and mentorship in the United States Department of Education White House Initiative for Historically Black Colleges and Universities (HBCU). Mays-Jackson asked the U.S. Department of Education to give JSU permission to start a  Construction Program.

34.     Through the Construction Program, Mays-Jackson saved JSU millions of dollars in Education and General State Funds yearly by utilizing Title III funds for HVAC, roofing,

and instructional classroom upgrades and repairs. When Mays-Jackson joined JSU, the university received less than four million dollars annually in Title III funding. By 2020, JSU was receiving more than $11 million yearly in Title III funding.

35. Before joining JSU, Mays-Jackson served as Vice President of the Utica and Vicksburg campuses of Hinds Community College. On the two campuses, May-Jackson supervised all operations including Academic Affairs, Student Affairs, Career and Technical, Workforce Placement, Housing, Maintenance & Facilities, Financial Aid, Enrollment Management, Registrar, Recruitment, and Title III/HBCU.  Mays-Jackson supervised EEOC/Civil Rights Affairs and was the college representative at the Mississippi Community College Board for all Hinds Community College campuses.

36. While serving as Vice President at Hinds Community College, Mays-Jackson met with officials from the United States Department of Agriculture to secure funds to reinstate the agriculture program on the Utica Campus. The program was reinstated in the second year of Mays-Jackson's administration. Further, enrollment at the Utica and Vicksburg campuses increased by 37 percent. Mays-Jackson also increased external funding to more than $8 million, facilitated an $8 million renovation of the Utica Campus Student Center, managed the building of a $2 million Cosmetology and Barbering facility on the Utica Campus.

37. Program offering increased by 75 percent on the Vicksburg-Warren campus under Mays-Jackson who requested and garnered approval for a $10 million multi-purpose complex on the campus. In addition, Mays-Jackson has co-authored four journal articles from 2016 through 2018.

38. Mays-Jackson also participated in and completed the American Association of State Colleges and Universities (AASCU) 2020 Millennium Leadership Initiative (MLI) Class Group. MLI is a premier higher education leadership development program that was created by the African American Presidents of AASCU to help prepare traditional higher executive leaders for university and college presidencies and chancellorships.

39. Unlike Mays-Jackson, Hudson had no documented experience or success in education or as an educational leader. At the time of his appointment, Hudson had only served as an Equal Employment Opportunity Specialist (FEMA), Chief Diversity and Equal Employment Opportunity Officer, and Special Assistant to Bynum. Hudson did not supervise any employees during his career until he became a Special Assistant to Bynum.

40. While Thompson worked in education, like Hudson, Thompson never served as an assistant principal, principal, or assistant superintendent as did Mays-Jackson. There is no public record of Thompson serving in an administrative role at any university. While Thompson served as chief of staff, deputy commissioner, and chief administrative officer, he had no tangible day-to-day experience leading a division within a university or university and his experience was not comparable to Mays-Jackson.

41. Within fifteen months of his appointment to the President's position, Hudson was placed on administrative leave.

42. On March 6, 2023, IHL board members were positioned to name Hudson's friend Thompson as Interim President of JSU. Upon information and belief, after Hudson was named President, he wrote a letter to Walter A. Brown, Executive Director and Professor in Urban Higher Education, in support of Thompson's admission to the program. Upon

information and belief, Hudson and JSU Provost Alisa Mosley were instrumental in awarding Thompson thousands of dollars in scholarship funding at a time when Thompson's whose annual salary at IHL exceeded more than $200,000 and JSU was sending students home who were financially unable to pay JSU.

43. Elayne Hayes Anthony, a female, was named "Temporary Acting President" when Hudson was placed on administrative leave. Before IHL announced it would conduct a national search to replace Hudson, Cunningham sought to prevent Elayne Hayes Anthony, a female, from applying for the President's position.

44. IHL subsequently hired Academic Search to conduct the national search to fill the President's post at JSU. Academic Search previously conducted a presidential search for the University of South Carolina-Upstate, a predominantly white institution. Academic Search selected Mays-Jackson for an interview for the position of President at the University of South Carolina-Upstate.

45. Mays-Jackson was one of the 79 applicants who sought the President's position after Hudson left JSU. Cunningham, Ormella Cummings, Bruce Martin, Gee Olgetree and Hal Parker, members of the search committee to replace Hudson, sabotaged Mays-Jackson's efforts to become JSU's 13th President. Aware of Mays-Jackson's 2021 EEOC Complaint, the selection committee members narrowed the pool of applicants and decided Mays-Jackson would not be interviewed. According to Thompson's statements to the Clarion-Ledger, he interviewed for the position. Upon information and belief, Thompson also sat in the interviews of other candidates. Upon information and belief, Thompson was not one of the 97 individuals who submitted applied for the President's job at JSU through Academic

Search.

46. IHL has only selected female Presidents at its Historically Black Colleges and Universities after national searches were conducted. JSU's only female president, Carolyn Meyers, was named JSU's 10th President after IHL conducted a national search. Similarly, IHL named Felecia Naves, President of Alcorn State University, after conducting a national search to replace Rankins, who served as President of the land grant college before he became the Commissioner of IHL. Donna Oliver became the first female President of Mississippi Valley State University after a search was conducted by Greenwood/Asher & Associates.

47. When Carolyn Meyers resigned, IHL launched a national search to replace her. IHL abandoned the national search after Roslyn Clark Artis, a female, emerged as the top contender for the job. Rather than name a clearly better-qualified female, IHL selected Bynum, a male, as JSU's 11th President, much to the chagrin of JSU constituents.

48. IHL repeated that course of action when Hudson and Thompson were named President(s) of JSU.

49. IHL board members passed over Mays-Jackson for Interim President and voted to hire Hudson as Interim President and President and Thompson as President even though Mays-Jackson was clearly more qualified than both of the men. IHL board members rubberstamped Alfred Rankins' recommendation to forego a national search and to name Hudson as President without affording Mays-Jackson an opportunity to apply for the position. Alfred Rankins knew or should have known that Hudson's violation of Title VII and Title IX rendered him unqualified to lead JSU.

50. Notwithstanding that, IHL board members rubberstamped Commissioner Rankins' recommendation to hire Hudson as President when Mays-Jackson was clearly more qualified for the position than Hudson. Three years later, Steven Cunningham, Ormella Cummings, Bruce Martin, Gee Olgetree and Hal Parker denied Mays-Jackson an interview but interviewed and voted with the other IHL board members to hire Thompson when Mays-Jackson was clearly more qualified than Thompson and Thompson had been treated more favorably than Mays-Jackson in the terms and conditions of her employment.

51. All actions Mays-Jackson complains about herein were taken by IHL board members, all policymakers for IHL, pursuant to an unwritten policy of treating males seeking to become Institutional Executive Officers more favorably than their female counterparts after conducting sham searches and selecting men within the inner circle of IHL. The violation of Mays-Jackson's constitutional right to be free from sex discrimination was the moving force behind the unwritten policy.

52. At all times pertinent herein, Mays-Jackson had a clearly established right to be free from sex discrimination in public employment and the actions of the defendants were not objectively reasonable.

## CAUSES OF ACTION

53. In this complaint when it is alleged that Commissioner Rankins, IHL, IHL board members in their official and individual capacities, committed any act or omission, it is meant that IHL's officers, directors, vice presidents, agents, servants or employees committed such acts or omissions and that at the time such act, commission or omission was committed, it was done with the full authorization, ratification or approval of IHL or was it

done in the routine normal course and scope of employment of IHL officers, directors, vice presidents, agents, servants or employees unless otherwise stated in this Complaint.

## 1983 SEX DISCRIMINATION

54. Mays-Jackson realleges all prior paragraphs of the Complaint as if set out here in full.

55. Mays-Jackson was clearly more qualified for the position of President of JSU when Hudson and Thompson were named President of JSU. Mays-Jackson's gender was a motivating factor in the employment and compensation-related decisions made regarding her. At the time of IHL's illegal actions, Mays-Jackson had a clearly established right to be clear of discrimination on account of her sex. The conduct of Rankins and IHL board members was objectively unreasonable.

56. As a result of IHL's actions, Mays-Jackson suffered damage in the past and will suffer damages in the future.

## DAMAGES

57. Because of the foregoing misconduct of the defendants, Mays-Jackson sustained pain and suffering, physical injury, great mental distress, depression, insomnia, shock, fright, and humiliation. Mays-Jackson has been damaged in an amount exceeding the jurisdictional requirements of this Court.

## RELIEF

58. Plaintiff requests that the Court issue the following relief:

    a. Award Mays-Jackson prospective relief of instatement to the position of

    President and compensatory damages for the intentional sex discrimination (Section 1983, Fourteenth Amendment). Mays-Jackson suffered at the hands of IHL board members and IHL Commissioner Rankins in an amount to be determined by a jury of her peers.

 b. Award Mays-Jackson attorney fees, costs, and expenses of litigation and.

 c. Award Mays-Jackson such other relief to which Plaintiff may be entitled under law.

**WHEREFORE PREMISES CONSIDERED**, Mays-Jackson demands judgment against the Defendants in an amount exceeding the jurisdictional requirements of this Court, all together with the costs and disbursement action, including attorneys' fees, plus interest, and for any other relief which this Court deems just and proper.

**RESPECTFULLY SUBMITTED** this, the 15th of February 2024.

                **DEBRA MAYS JACKSON**

                By: /s/ Lisa M. Ross
                 Lisa M. Ross (MSB#9755)
                 Post Office Box 11264
                 Jackson, MS 39283-1264
                 (601) 981-7900 (telephone)
                 (601) 981-7917 (facsimile)
                 lross@lmrossatlaw.com

                Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I, Lisa M. Ross, do hereby certify that this day I have caused to be filed a true and correct copy of the above document using the Court's ECF system that sent notification of such filing to all counsel of record.

**SO, CERTIFIED**, this the 15th day of February 2024.

//s// Lisa M. Ross<br>Lisa M. Ross